*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

THOMAS HOWARD CONFERE,

Defendant-Appellant.

UNPUBLISHED
March 17, 2020

No.  345141
Macomb Circuit Court
LC No.  2018-000190-FH

Before:  TUKEL, P.J., and MARKEY and SWARTZLE, JJ.

PER CURIAM.

On appeal from multiple convictions of assaultive crimes, defendant argues that he would have been acquitted of all charges if the trial court had excluded several pieces of evidence that it admitted at trial.  In addition, defendant argues that the within-guidelines sentences imposed by the trial court for his convictions were unreasonable because they were not specifically designed to address his mental-health issues.  Because defendant's arguments are without merit, we affirm.

## I.  BACKGROUND

### A.  THE DOMESTIC-VIOLENCE INCIDENT ON DECEMBER 31, 2017

This case arises from a domestic-violence incident involving defendant, his wife Amber Casali, and Casali's 14-year-old son, MK.  On December 31, 2017, Macomb County Sherriff's deputies received a call reporting domestic violence at the home of Sheila and Art Green, defendant's mother and stepfather.  When the deputies arrived, they observed that Casali had lacerations on her face, a swollen eye, a bloody nose, bruising on her left arm, and a laceration on her neck.  MK had "a lot of blood all over his face," seeping from a "large laceration" on the left side of his head.  He had a scratch above his eye, marks on his neck, a bloody nose, and the hair on the back of his head was blood-soaked.  Defendant also "had blood on him."  A deputy found "blood splatter" throughout the house, including on the stairs leading to the basement.  Casali and MK handwrote statements for the deputies that identified defendant as the aggressor in a domestic-violence incident.

At trial, MK testified regarding the incident. MK testified that he was in his bedroom when he heard Casali screaming in pain. Casali also screamed MK's name, which she had never done during any previous argument with defendant. MK did not immediately respond to the screams because he thought he would get hurt if he attempted to help Casali. But, after a moment, MK grabbed a small, plastic guitar and ran to the bedroom that belonged to defendant and Casali. MK found defendant on top of Casali. Although she had been screaming for several minutes, Casali was now silent, and MK thought that defendant was strangling her. MK swung the guitar as hard as he could, and hit defendant three times in the area of his upper back and neck. Defendant then grabbed the guitar and broke it over MK's head.

MK testified that he fled to the basement and hid, but defendant followed him to the basement and threw him against a metal bed frame. Defendant then lifted MK off his feet, pushed him against some storage items, and punched him in the face more than five times. Defendant began choking MK and punched him in the face several more times. Defendant's stepfather eventually intervened and took MK upstairs shortly before the deputies arrived.

Defendant's mother, Sheila, testified to a contrasting version of events, and claimed that defendant never hit either MK or Casali. According to Sheila, MK sustained his injuries when he assaulted defendant without provocation. She testified that when MK struck defendant with the guitar, a piece of plastic broke off and hit MK in the head.

Casali, who was not initially expected to testify, appeared on the third day of trial. She testified that she was too high on drugs to remember the incident that led to this case. The jury did, however, see photographs of Casali's injuries.

After providing their statements to deputies, MK and Casali were transported to the hospital in the same ambulance. Five staples were required to close MK's head wound. He was transferred to Detroit Children's Hospital, where he stayed overnight, because he was suffering from light-headedness. Casali was also hospitalized overnight. At trial, MK could not recall Casali's precise injuries, but he did remember that something was wrong with her eye and nose. The prosecutor asked MK, "What was wrong with her eye?" MK started to respond, "I don't remember exactly what, but she said she—"; defense counsel then objected on hearsay grounds. The trial court ruled that the testimony was admissible under MRE 803(3), governing statements regarding a declarant's then-existing mental, emotional, or physical condition. The prosecutor then asked MK, "Did she tell you whether she had any fractures on her face?" MK responded, "Around her eye" and "[h]er nose." The trial court interrupted the prosecutor's line of questioning, stating that the hearsay statement was admissible regarding Casali's description of her existing physical sensations, but that Casali was not qualified to determine that she had suffered a fracture. MK then testified that Casali complained of pain in her face when she picked him up from the hospital.

## B. MEDICAL RECORDS

Before MK testified, the prosecutor moved to admit medical records related to both MK's and Casali's treatment resulting from the December 31, 2017 incident. The prosecutor reported that defense counsel had received the records during discovery, but had not received a certification

page or written notice that the prosecutor intended to seek admission of the medical records at trial. The trial court initially excluded the records from evidence based on MRE 902(11).

After MK's testimony, the prosecutor revisited the issue regarding the medical records, arguing that providing defense counsel with the medical records months before trial was sufficient notice that the prosecutor intended to use those records at trial. The trial court noted that MCR 6.201 merely required a description and opportunity to inspect physical evidence as a mandatory disclosure. Therefore, the trial court reasoned, turning over the medical records to defense counsel without a request from him could constitute written notice. Further, the trial court agreed with the prosecutor that law enforcement always retained a certified copy of any medical records they turned over to the prosecutor's office. Therefore, the trial court ruled that the prosecutor had met the requirements of MRE 902(11)(C) and admitted the records into evidence as business records under MRE 803(6).

Casali's medical records contained, in quotation marks, the following statement: "My husband assaulted me and hit me several times in my face with a fist, and also hit me over the back with a fan." The trial court ruled that this statement was admissible. In addition, the prosecutor read for the jury the following contents of Casali's medical records:

> Alleged assault by husband. Assault two days prior. History of present illness: 31-year-old female, approximately three hours after being assaulted by her husband, her husband was there, he was evaluated, assaulted by the same, choked for several seconds, hit . . . over her back with a fan, she did not experience loss of consciousness, she has a safe place to go, she went to urgent care a few days before because of another assault . . . but told urgent care that she fell down the stairs.

The trial court ruled that "[a]ll statements apart from how the specific injury was sustained should be stricken because it really has no bearing as to the medical diagnosis and treatment." Nevertheless, the prosecutor was permitted to impeach Casali with that portion of her medical records. Casali explained that she did not recall telling medical personnel that she had been to urgent care on December 29, 2017, or telling medical personnel that she had fallen down the stairs.

## C. PRIOR DOMESTIC-VIOLENCE INCIDENTS

On March 7, 2018, 84 days before trial, the prosecutor filed a notice of intent to introduce, under MCL 768.27b, evidence that defendant slapped and pushed Casali on October 22, 2016. The prosecutor appended to the notice a police report, photographs of Casali, and Casali's handwritten-witness statement from the October 22, 2016 incident. When trial began, both parties anticipated that Casali would not testify. Defendant therefore argued that admission of evidence related to the October 22, 2016 incident would violate his right to confront the witness against him. The prosecutor responded that MK, who had knowledge of defendant's "propensity to assault those with whom he lives," could provide testimony regarding the October 22, 2016 incident in Casali's place.

During voir dire, outside the presence of the jury, MK testified that he had either seen or heard arguing and physical violence between defendant and Casali on several occasions. Although he had considered intervening on those prior occasions, he had never acted because he feared for

his own safety. MK did not specifically recall what happened during the October 22, 2016 incident, and explained that he was in his bedroom. MK recalled seeing police cars outside the house and, although Casali appeared "sad," he did not recall seeing any visible injuries.

Regarding the incident on October 22, 2016, the trial court ruled that "there's been no testimony as to any sort of assault, so it's not going to be pertinent for the members of the jury." The prosecutor pointed out that MK had, on multiple occasions, contemplated intervention upon hearing noises that made him think defendant was hurting Casali. Defense counsel responded that MK could not point to a specific act to justify admission under MCL 768.27b, and argued that MK's testimony was "nothing but speculation" and "not relevant." The trial court ruled that the probative value of MK's proposed testimony would be outweighed by the risk of unfair prejudice if the testimony was offered to show defendant's propensity for domestic violence. Therefore, the jury never heard MK's proposed testimony about the October 22, 2016 incident—that he did not know what occurred except that police cars arrived at his house and that Casali looked "sad."

When Casali unexpectedly appeared to testify on the third day of trial, she downplayed the October 22, 2016 incident, stating that defendant merely chased her around the kitchen table and grabbed her arm. After Casali's testimony regarding this incident, the prosecutor handed her several photographs. Casali testified that the photographs depicted her crying, with a "slightly red arm." When asked whether she remembered the night the pictures were taken, Casali responded that she had been high on morphine and had blacked out that night. Defendant did not object to any of the prosecutor's questions regarding the photographs. The trial court excluded the photographs from evidence on the ground that they were not authenticated, as Casali did not remember them being taken. Therefore, the jury never saw the photographs.

The prosecutor asked Casali if she was too high on drugs to remember writing statements about domestic-violence incidents on October 22 and 31, 2016. Casali responded that she was. The prosecutor then handed Casali a document. She testified that it was titled "victim impact statement" and that it contained her handwriting and signature, but she did not remember writing it. Defendant did not object to Casali's testimony about the written statement. The contents of the written statements were never divulged to the jury. The trial court excluded the written statements on the ground that they constituted hearsay not within any exception.

The prosecutor then pointed out that defendant was claiming self-defense on the ground that MK had unlawfully attacked him. Therefore, the prosecutor argued that MK's testimony about prior instances of domestic violence would be probative of whether he reasonably believed that attacking defendant was necessary to protect Casali. Defense counsel responded that MK's reason for attacking defendant was irrelevant if MK was the first attacker. The trial court ruled that MK's state of mind was relevant, and decided to allow MK's testimony that he had seen or heard defendant commit other acts of domestic violence against Casali in the past. In accordance with the trial court's ruling, MK testified that he had, on several occasions, heard Casali screaming in pain while arguing with defendant, and that, months before the incident, he had witnessed defendant throw Casali "into the stairs."

-4-

## D. JURY VERDICT AND SENTENCES

At the close of trial, the jury convicted defendant of assault and battery, MCL 750.81, assault with intent to do great bodily harm less than murder (AWIGBH), MCL 750.84, and assault with a dangerous weapon, MCL 750.82. The trial court sentenced defendant to 93 days in jail for the conviction of assault and battery, 4 to 10 years in prison for the conviction of AWIGBH, and 32 months to 4 years in prison for the conviction of assault with a dangerous weapon.

Defendant now appeals.

## II. ANALYSIS

On appeal, defendant argues that it is more probable than not that he would have been acquitted of all charges if the trial court had excluded several pieces of evidence that it admitted at trial. Defendant also argues that he is entitled to resentencing because his within-guidelines sentences were not specifically designed to address his mental-health issues; he argues that jail time and probation with a component of mental-health treatment would be more appropriate.

## A. ADMISSIBILITY OF EVIDENCE

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). At trial, defendant objected to MK's "other-acts" testimony, MK's hearsay testimony about Casali's injuries, the admission of photographs and Casali's written statement related to the October 22, 2016 incident, and the admission of MK's and Casali's medical records. Therefore, those issues are preserved for appeal. See *id*. Defendant did not object to Casali's testimony about the October 22, 2016 incident itself, or her testimony about the photographs and written statement related to that incident. Therefore, those issues are not preserved for appeal. See *id*.

We review for abuse of discretion a trial court's decision to admit or exclude evidence. *Id*. at 251. A trial court abuses its discretion when that decision falls outside the range of principled outcomes. *Id*. at 251-252 (cleaned up). "A decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *Id*. at 252.

Furthermore, "[p]reserved nonconstitutional errors are subject to harmless-error review." *Id*., citing MCL 769.26. "[I]f the issue is preserved, the defendant has the burden of establishing a miscarriage of justice under a 'more probable than not' standard." *Id*., quoting *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999). "If the constitutional or nonconstitutional error is not preserved, the defendant must show a plain error that affected substantial rights." *Thorpe*, 504 Mich at 252. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the

fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763 (cleaned up).

## 1. MK'S TESTIMONY

Defendant argues that he did not receive notice of MK's "other-acts" testimony as required by MCL 768.27b, that the testimony constituted inadmissible character evidence under MRE 404(b), that the testimony was more prejudicial than probative under MRE 403, and that defendant was, in fact, prejudiced by the admission of this evidence.

As explained above, MK testified that he had, on several occasions, heard Casali screaming in pain while arguing with defendant. In addition, he testified that, months before the incident giving rise to the trial, he had witnessed defendant throw Casali into the stairs. The trial court did not err in admitting this portion of MK's testimony under MRE 404(b). Even though the trial court initially excluded the testimony under MRE 403 when it was offered to show defendant's propensity for domestic violence, it eventually allowed the testimony to show that MK reasonably believed that attacking defendant was necessary to protect Casali. The notice requirement of MCL 768.27b(2) was not, as defendant argues, a barrier to admitting the testimony for that purpose under MRE 404(b). See MCL 768.27b(3) ("This section does not limit or preclude the admission or consideration of evidence under any other . . . rule of evidence.").

MRE 404(b)(1) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes." Rebuttal of a defendant's self-defense claim is one such "other purpose," provided that the evidence was relevant to the self-defense claim under MRE 402, and its probative value was not substantially outweighed by the risk of unfair prejudice under MRE 403. See *People v Denson*, 500 Mich 385, 398; 902 NW2d 306 (2017).

Once a prima-facie case for self-defense was established by the fact that MK hit defendant with the plastic guitar, the prosecutor bore the burden of disproving the claim of self-defense, beyond a reasonable doubt. See *Denson*, 500 Mich at 399. On the facts of this case, the prosecutor was required to prove that defendant *did not* reasonably believe that his use of force was necessary to defend against "the imminent *unlawful* use of force" by MK. MCL 780.972(2) (emphasis added). The reasonableness of MK's belief that attacking defendant was necessary to protect Casali is logically relevant to whether defendant was protecting himself from an *unlawful* use of force by MK. MK testified that he had, on several occasions, heard Casali scream in pain while arguing with defendant. He had seen defendant throw Casali into the stairs. Yet, MK had never acted in Casali's defense until December 31, 2017—the first time Casali had ever screamed *MK's name*. That testimony was highly probative of whether MK had a reasonable belief that something was different this time; that he had to act because defendant was seriously hurting Casali. The probative value of MK's general "other-acts" testimony in rebutting defendant's self-defense claim significantly outweighed the risk of unfair, propensity-related prejudice. Therefore, the trial court did not err in admitting the testimony.

As explained above, MK also testified about Casali's injuries from the December 31, 2017 domestic-violence incident. MK could not recall Casali's precise injuries, but he did "remember something wrong with her eye and her nose." The prosecutor asked: "What was wrong with her

eye?" MK started to respond, but defendant objected on hearsay grounds. The trial court ultimately ruled that MK's response was admissible under MRE 803(3), the exception for a declarant's "then existing mental, emotional or physical condition." Immediately after the trial court ruled the testimony admissible, the prosecutor asked, "Did she tell you whether she had any fractures on her face?" MK responded that Casali suffered fractures around her eye and in her nose.

Even if MK's testimony about Casali's medical diagnoses did not fall within an exception to the hearsay rule, any potential error involved with the admission of the testimony was harmless. The comment was brief and isolated. Moreover, the trial court cautioned the jury that the testimony was admissible regarding Casali's report of her existing physical sensation or condition, but that Casali was not qualified to make a medical determination regarding a fracture. "[J]urors are presumed to follow their instructions." *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). Therefore, the jury is presumed to have considered this evidence only for the limited purpose identified by the trial court.

Furthermore, a deputy testified that Casali sustained a black eye and bloody nose on December 31, 2017, and the jury saw photographs of Casali's injuries. Thus, MK's isolated statement was cumulative on this issue. Accordingly, defendant's argument that he was unduly prejudiced by MK's testimony that Casali told him she sustained fractures to her eye and nose is without merit.

## 2. CASALI'S TESTIMONY

Next, defendant argues that he was prejudiced when the trial court allowed Casali to testify about the October 22, 2016 incident, as well as the photographs and written statement the police took following that incident.

MCL 768.27b provides:

(1) Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence or sexual assault, evidence of the defendant's commission of other acts of domestic violence or sexual assault is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.

(2) If the prosecuting attorney intends to offer evidence under this section, the prosecuting attorney shall disclose the evidence, including the statements of witnesses or a summary of the substance of any testimony that is expected to be offered, to the defendant not less than 15 days before the scheduled date of trial or at a later time as allowed by the court for good cause shown.

Eighty-four days before trial, the prosecutor provided defendant notice that it intended to introduce evidence of the October 22, 2016 incident. When Casali failed to appear for the first two days of trial, the prosecutor offered MK as a replacement witness to introduce the MCL 768.27b evidence. After a thorough voir dire outside the jury's presence, the trial court ruled that

MK had not directly observed the October 22, 2016 incident, and therefore, his testimony about the incident was too prejudicial to justify admission for propensity purposes under MCL 768.27b.

When Casali unexpectedly appeared to testify on the third day of trial, she was allowed to testify about the prior incident because she was a direct participant in the events of that evening. Casali, however, downplayed the October 22, 2016 incident, stating that defendant merely chased her around the kitchen table and grabbed her arm. Defendant was given proper notice of Casali's testimony regarding the October 22, 2016 incident. He does not, on appeal, specify why her testimony about the incident itself was prejudicial to him beyond stating that propensity evidence is prejudicial by its nature. The trial court did not err in allowing Casali to testify about the incident.

Defendant also argues that the trial court erred when it allowed Casali to testify about photographs and written statements the police took following the October 22, 2016 incident. Defendant does not offer a legal theory regarding why this testimony was inadmissible beyond arguing that "[t]his was all MCL 768.27b and MCL 768.27c evidence that had been excluded by the trial court as more prejudicial than probative." As stated above, the prosecutor gave adequate notice under MCL 768.27b(2) of the evidence relating to the October 22, 2016 incident that it intended to introduce. Presumably, therefore, defendant's argument depends on the prejudicial impact of Casali's testimony about the photographs and written statements. Defendant admits that the trial court did not admit the photographs or written statements themselves into evidence.

The photographs were never shown to the jury. The trial court excluded the photographs from evidence on the ground that they were not authenticated, as Casali did not remember them being taken. The contents of the written statements were never divulged to the jury. The trial court excluded the written statements on the ground that they constituted hearsay not within an exception. Therefore, defendant effectively argues that the outcome of his trial was affected when Casali was allowed to testify 1) that she was handed a photograph depicting her crying with a "slightly red arm," and 2) that she was handed documents entitled "witness statement" and "victim impact statement" that contained her handwriting and signature, but she did not remember writing them. Defendant does not explain why allowing the prosecutor's attempt to authenticate the photographs and written statements constituted error. He does not explain how Casali's limited testimony about the photographs and written statements relating to the October 22, 2016 incident possibly could have changed the outcome of a trial about the December 31, 2017 incident, about which MK testified at length. Therefore, the trial court did not commit plain error.

### 3. MK'S AND CASALI'S MEDICAL RECORDS

The prosecutor concedes that the trial court abused its discretion in admitting MK's and Casali's medical records into evidence because defendant did not receive proper notice that the prosecutor intended to introduce the records as self-authenticating under MRE 902.

Before MK testified, the prosecutor moved to admit MK's and Casali's medical records. The prosecutor reported that defense counsel had received the records during discovery, but had not received a certification page or written notice that the prosecutor intended to admit the records. The trial court excluded the records based on the plain language of MRE 902(11).

After MK's testimony concluded, the prosecutor revisited the issue regarding the medical records, arguing that providing defense counsel with the medical records months before trial was sufficient notice that the prosecution intended to use those records at trial. The trial court noted that MCR 6.201 merely required a description and opportunity to inspect physical evidence as mandatory disclosure. Therefore, the trial court reasoned, turning over the medical records to defense counsel without a request from him could constitute written notice. Further, the trial court agreed with the prosecutor that law enforcement always retained a certified copy of any medical records they turned over to the prosecutor's office. Therefore, the trial court ruled that the prosecutor had met the requirements of MRE 902(11)(C) and admitted the records into evidence as business records under MRE 803(6).

The text of MRE 902(11) is clear. If the prosecutor intended to offer the medical records into evidence under that rule of evidence, she was required to provide defendant written notice of that intention and make the record and declaration of the record's custodian available sufficiently in advance of trial to provide defendant with a fair opportunity to challenge them.

Assuming without deciding that the trial court should not have allowed the prosecutor to impeach Casali with the hearsay statements contained within her medical records, any potential error was harmless. MK testified defendant and Casali had a tumultuous relationship. He claimed that on December 31, 2017, he ran to Casali's assistance when she called his name during an argument, which she had never done before. MK found defendant on top of Casali, who had been screaming for several minutes, but had fallen silent. He thought defendant was choking her, so he hit defendant with a plastic guitar. Defendant grabbed the guitar and broke it over MK's head. MK tried to escape to the basement. Defendant followed MK and continued his assault, lifting MK off his feet, throwing him into a metal bedframe, punching him in the face, and choking him. Defendant did not stop until his stepfather intervened. The deputies arrived to find MK crying, and holding a bloody rag to his head. Defendant asks this Court to disregard all this evidence and hold that he was prejudiced when the trial court admitted medical records chronicling the injuries suffered by Casali and MK. Defendant's theory that he was merely defending himself from a 14-year-old who unjustifiably attacked him was not undermined by any potential error in admitting the evidence. Defendant is not entitled to a new trial.

## B. SENTENCING

Lastly, defendant argues that he is entitled to resentencing because his within-guidelines sentences were not specifically designed to address his mental-health issues; he believes jail time and probation with a mental-health treatment component would be more appropriate.

This Court reviews only out-of-guidelines sentences for reasonableness. *People v Lampe*, 327 Mich App 104, 125-126; 933 NW2d 314 (2019). "When a trial court does not depart from the recommended-minimum-sentencing range, the minimum sentence must be affirmed unless there was an error in scoring or the trial court relied on inaccurate information." *People v Schrauben*, 314 Mich App 181, 196; 886 NW2d 173 (2016), citing MCL 769.34(10).

Defendant does not argue that his sentencing guidelines range was calculated incorrectly, nor does he claim that the court relied on inaccurate information. His sentencing-guidelines range for AWIGBH was 29 to 57 months. The trial court imposed a minimum sentence of 48 months

for the conviction for AWIGBH and a minimum sentence of 32 months for the conviction for assault with a dangerous weapon. Because the trial court did not depart from the recommended-minimum-sentencing range, and defendant does not allege a scoring error or argue that the trial court relied on inaccurate information, we must affirm defendant's sentences.

Even if this court were not bound by MCL 769.34(10), defendant would be unable to establish that his sentences are disproportionate. "[A] sentence within the Legislature's guidelines range is presumptively proportionate." *People v Odom*, 327 Mich App 297, 315; 933 NW2d 719 (2019). "In order to overcome the presumption that the sentence is proportionate, a defendant must present unusual circumstances that would render the presumptively proportionate sentence disproportionate." *People v Lee*, 243 Mich App 163, 187; 622 NW2d 71 (2000).

Defendant argues that his mental-health diagnoses present the unusual circumstances required to render his sentences disproportionate. Defendant was not found guilty but mentally ill. Contrary to defendant's argument that the trial court did not consider his mental-health conditions, the trial court delayed sentencing for defendant to apply to mental-health court. His application was denied. Defendant offers no authority to support his argument that his mental-health diagnoses are sufficient to render his within-guidelines sentences disproportionate. Defendant is not entitled to resentencing.

Affirmed.


/s/ Jonathan Tukel
/s/ Jane E. Markey
/s/ Brock A. Swartzle